IN THE UNITED SATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

|  |  |
|---|---|
| Qutique Manor,<br><br>           Plaintiff,<br>vs.<br><br><br>Town of Allendale,<br><br>           Defendant. | Civil Action No.<br><br><br><br><br>**COMPLAINT**<br>(Jury Trial Demanded) |

The Plaintiff complaining of the Defendants alleges that:

### PARTIES AND JURISDICTION

1. This action is brought pursuant to Title VII of the Civil Rights Act of 1964, alleging race discrimination; 42 U.S.C. § 1981 alleging race discrimination, and the South Carolina Human Affairs Law.

2. At all relevant times, Plaintiff was an employee of Defendant, the Town of Allendale (Defendant or Police Department).

3. Defendant is a law enforcement agency for the County of Allendale, the County where the acts and omissions complained of herein occurred.

4. Plaintiff is a resident of Hampton County, State of South Carolina, and the unlawful employment practices alleged herein were committed in Allendale County, South Carolina. Accordingly, venue lies with the Court of Common Pleas of Allendale County, in the State of South Carolina.

5. Prior to filing this civil action, Plaintiff filed a Charge of Discrimination for race and disability discrimination with the South Carolina Human Affairs Commission and the Equal Employment Opportunity Commission.

1

6. Plaintiff has fully exhausted all of his administrative remedies, and this action is timely filed.

## FACTUAL ALLEGATIONS

7. Plaintiff began working for Defendant in 2008, as a patrolman for the Allendale Police Department. Chief Sullivan (Sullivan), a white male, was Plaintiff's immediate supervisor.

8. At all relevant times, throughout the duration of Plaintiff's employment with Defendant, his performance met or exceeded the reasonable expectations of his employer.

9. After a period of time of successful service to the police department, Plaintiff was promoted to Sergeant. As a Sergeant, Plaintiff's annual salary averaged between Forty and Forty-Three Thousand and No/100 ($40,000.00 & $43,000.00) dollars for the last three (3) years. Plaintiff's annual earnings were a result of his hourly wage and overtime pay.

10. In or around December 2013, Plaintiff was approached about a promotion to his current position of Detective. At the time, Plaintiff's position was held by Detective Donnie Hutto (Hutto) who, upon information and belief, was earning around Forty Six Thousand and No/100 ($46,000.00) dollars a year.

11. Along with the promotion to Detective, Plaintiff was promised by Dwayne Ennis (Ennis), the Town Administrator and a black male, an increase in pay. As a Sergeant prior to Plaintiff's promotion, Plaintiff was a non-exempt employee entitled to overtime. When Plaintiff was promoted to Detective, Plaintiff became an exempt employee unable to earn overtime. Despite not receiving overtime, Plaintiff was told by Ennis, that due to the pay increase, Plaintiff would be making around Forty-Five Thousand and No/100 ($45,000.00) dollars a year.

12. Around this time, Plaintiff began the process of purchasing a new home and relied upon Ennis' representation as to the increase in income expected to result from his promotion to Detective. Plaintiff made plans to build a home for his family. Plaintiff asked Ennis to inform his home loan lender that

he would be receiving an increase in salary. Plaintiff relied upon Ennis' representation that Plaintiff would get a pay increase when he requested a certain loan amount to build a house. One of the main reasons that Plaintiff made plans to build his home was to ensure that he could have his children in the same school district, instead of having to travel a significant distance to deliver one child to one district and another to the other.

13. Furthermore, when Plaintiff could build his home, they could rent his wife's home and have extra income. Plaintiff spent approximately $10,000 to have the land cleared and ready to build the house.

14. On February 26, 2014, Plaintiff received a letter from Sullivan stating that he would receive a salary for his new position of Detective of Thirty-Six Thousand Seven and 20/100 ($36,067.20) dollars. This was a significant decrease from the representations made by Ennis to Plaintiff. It was also a significant decrease from what Plaintiff was being paid as Sergeant, who could earn overtime.

15. Because of the representations of Ennis Plaintiff's Mortgage Company financed Plaintiff's home for an amount much higher than Plaintiff would have been able to afford with the Thirty-Six Thousand Sixty-Seven and 20/100 ($36,067.20) dollars amount of pay.

16. Ennis made false representations about Plaintiff's income to his mortgage company and did so with the knowledge that Plaintiff was relying on the representation of his income in securing Plaintiff's home loan. In addition, the purpose of the representation was to induce Plaintiff to take the promotion as Detective, thereby becoming an exempt employee unable to earn overtime.

17. The fraudulent representations made to Plaintiff by Ennis upon which Plaintiff relied were made by Ennis within the scope of his employment as Town Administrator. Plaintiff had no knowledge of the falsity of the representations. As a result of Plaintiff's detrimental reliance on Ennis' representation, Plaintiff defaulted on his loan issued to him by his mortgage company. As a result, Plaintiff experienced significant damages.

18. Immediately after receiving the letter from Chief Sullivan about Plaintiff's rate of pay, Plaintiff approached Chief Sullivan to inquire why he was not being paid the amount Plaintiff was promised. Sullivan informed Plaintiff that Ennis had lied to him, and the Town of Allendale had never agreed to pay Plaintiff Forty-Five Thousand and No/100 ($45,000.00) dollars.

19. Ennis informed Plaintiff that he only made that representation in terms of paperwork for his mortgage company and Defendant never had agreed to pay Plaintiff the higher rate.  Plaintiff never asked Ennis to make such a representation to his mortgage company rather Plaintiff specifically informed Ennis that he should give them what his actual rate of pay would be.

20. Concerned about these misrepresentations, Plaintiff approached Sullivan, (his white supervisor) to obtain assistance.  In doing so, Plaintiff followed proper procedure and chain of command.

21. Ennis discovered that Plaintiff approached Sullivan and was extremely displeased.  Ennis made it clear to plaintiff that he was upset that Plaintiff would go to Sullivan, a white male instead of Ennis, a black male, about the issues related to Plaintiff's pay.

22. Plaintiff chose to record the conversation with Ennis because of the threat made to Plaintiff wherein Ennis angrily told Plaintiff to come to his office because he was, "going to fuck [him] up." (See Exhibit A and B)

23. During the conversation, Ennis made it clear that he strongly disapproved of Plaintiff approaching Sullivan and believed Plaintiff should have come to him. Ennis espoused extremely racist views, displaying his displeasure that Plaintiff did not come to him regarding the pay issues. Ennis stated, "don't never go behind the source."  He asked Plaintiff specifically, "what color me and you is?" Plaintiff responded that they were black.  Ennis then asked Plaintiff, "what color Chief and Donnie was?" Plaintiff responded "white."  Ennis then told Plaintiff, "you have to get on board, or you're not

going to see much." Ennis suggested to Plaintiff that if he wants to get anything done in the Town of Allendale, Plaintiff, as an African American, needed to work only with other African Americans.

24. During the conversation, Ennis took a phone call from someone else. During the conversation with the unknown caller, Ennis bragged, "I feel real happy today cause I made a cracker mad." At another time during this phone conversation, Ennis stated "I let him know you don't mess with no black man."

25. Ennis made it clear to Plaintiff that if he wanted to make more money, then he needed to go to him and not go to "no white" and advised "remember one thing; I'm black." and "no matter what people think of you, never let the right hand know what the left hand do."

26. Plaintiff was shocked by the comments Ennis made during this conversation and pretended to agree with Ennis' assertions about what he should do in the future or what he should have done. However, Plaintiff strongly disagrees with the course of action suggested by Ennis, evidenced by the fact that he previously took the appropriate course of action by addressing his pay issues with his supervisor, Sullivan.

27. Thereafter, Ennis began to use his position to retaliate against Plaintiff. Plaintiff has not received the pay raise he was promised. Ennis prevented Plaintiff from receiving the new patrol car that he was promised, even though subordinate employees have received newer cars and equipment.

28. Ennis has made false and damaging statements about Plaintiff's work performance and has accused him of refusing to do his job or work past a forty (40) hour work week. These untrue statements have had the effect of tarnishing Plaintiff's reputation with the Town of Allendale.

29. Upon information and belief, Ennis has bragged about the fact that he is attempting to get Plaintiff fired.

30. Ennis has even gone so far as to approach a couple of individuals within the department about replacing Plaintiff and taking over his position. Ennis has also promised those individuals the salary

increase that was promised to Plaintiff, which by Ennis's own admission, was never approved by the council.

31. These discriminatory and retaliatory acts have made Plaintiff's ability to perform successfully perform and enjoy his job impossible.

32. Ennis disapproved of the fact that Plaintiff, a black male, would approach his white supervisor about concerns about his pay, instead of going to Ennis, a black male. Ennis espoused racist views that Plaintiff had done something wrong by seeking assistance from a non-black agent of Defendant. The underlying message in Ennis' racist remarks was that in the Town of Allendale, black employees needed to stick with other black employees, and not doing so was an affront to their race. Had Plaintiff been a white male, Ennis and sought help from his white supervisor, Ennis would not have taken issue with his actions. Therefore, Plaintiff was discriminated against by Ennis for his race in violation of Title VII.

33. As a result of his disapproval of and anger at Plaintiff's seeking assistance from his white supervisor, Ennis began to retaliate against the Plaintiff. Denying him the benefits of his job that he was rightfully entitled to receive in violation of Title VII.

**FOR A FIRST CAUSE OF ACTION**
(Race Discrimination in Violation of Title VII)

34. Plaintiff incorporates the allegations in paragraphs 1 through 33 above as fully as if set forth verbatim herein.

35. The intentional actions taken by the Defendant, as described herein, violate the Plaintiff's rights under Title VII of the Civil Rights Act of 1964.

36. Defendant and its employees unlawfully targeted the Plaintiff because he is black by making derogatory and racist remarks toward Plaintiff. Said racist remarks were, upon information and belief,

6

known by Defendant, who took no action to correct. In the alternative, Ennis acted as the alter ego of the Defendant in his role as Town Administrator.

37. As a direct result and consequence of said discrimination Plaintiff has and will suffer economic damages, including back pay, front pay, fringe benefits and has and will suffer compensatory damages, including emotional distress, mental anguish, and anxiety.

38. As a further direct result and consequence, Plaintiff is entitled to back pay, reinstatement, front pay, fringe benefits, compensatory damages, punitive damages, and attorney's fees and costs.

**FOR A SECOND CAUSE OF ACTION**
(Race Discrimination in Violation of 42 U.S.C. § 1981)

39. Plaintiff incorporates the allegations in paragraphs 1 through 38 above as fully as if set forth verbatim herein.

40. The intentional actions taken by the Defendant, as described herein, violate the Plaintiff's rights under 42 U.S.C. § 1981.

41. The Defendant, its agents, and/or its alter ego, unlawfully targeted the Plaintiff because he is black by making derogatory and racist remarks toward Plaintiff.

42. As a direct result and consequence of said discrimination, Plaintiff has and will suffer economic damages, including back pay, front pay, fringe benefits and compensatory damages, including emotional distress, mental anguish, and anxiety.

43. As a further direct result and consequence, Plaintiff is entitled to compensatory and punitive damages, in addition, to all damages, Plaintiff is entitled to under the Civil Rights Act of 1964, Title VII.

**FOR A THIRD CAUSE OF ACTION**
(Retaliation in violation of Title VII and 42 U.S.C. § 1981)

44. Plaintiff incorporates the allegations in paragraphs 1 through 43 above as fully as if set forth verbatim herein.

45. Plaintiff approached his supervisor with pay concerns, and it was because of his race that Defendant took retaliatory actions against Plaintiff which is a protected activity under Title VII and § 1981.

46. Shortly thereafter Defendant and its employees instituted a pattern of retaliation against Plaintiff.

47. As a direct result and consequence of said retaliation, Plaintiff has and will suffer economic damages, including back pay, front pay, fringe benefits and has and will suffer compensatory damages, including emotional distress, mental anguish, and anxiety.

48. As a further direct result and consequence, Plaintiff is entitled to back pay, reinstatement, front pay, fringe benefits, compensatory damages, punitive damages, and attorney's fees and costs.

**FOR A FIRST CAUSE OF ACTION**
(Promissory Estoppel, Detrimental Reliance)

49. Plaintiff incorporates the allegations in paragraphs 1 through 48 above as fully as if set forth verbatim herein.

50. Defendant, through its agent and/or alter ego, fraudulently represented to Plaintiff that he would receive a raise to take the Detective position. Plaintiff reasonably relied upon his employer to provide him accurate information about what his salary would be when Plaintiff tried to get a loan from his mortgage company. Plaintiff invested time and money into preparing a plot of land for the home he was going to build. Because Defendant made a false representation to Plaintiff, he defaulted on his loan and suffered economic hardships.

51. As a direct result and consequence of said retaliation, Plaintiff has and will suffer economic damages. Plaintiff is entitled to the amount of money that he would have earned had the promise been fulfilled, is entitled to be paid the amount he was promised in the future and is entitled to the amount of money lost in preparing his land to build a home.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, demands a trial by jury and respectfully prays for judgment against the Defendant for back pay, front pay, lost benefits of employment, compensatory damages, punitive damages, economic damages outlined in Paragraph 51 and attorney's fees and costs.

**CALLISON TIGHE & ROBINSON, LLC**

By. s/ Janet E. Rhodes
Janet E. Rhodes, Esquire (Fed. ID No.10521)
Post Office Box 1390
Columbia, South Carolina 29202
Telephone: 803-404-6900
Facsimile: 803-404-6902
Email: JanetRhodes@callisontighe.com

*Attorney for Plaintiff*

February 29, 2016
Columbia, South Carolina